McKinney, J.,
delivered the opinion of the court.
The plaintiff in error was indicted jointly with another slave named Tom, in the circuit court of Williamson, for the murder of Mary E. B. Marr, the infant child of their master and mistress. The jury acquitted Tom, and found the plaintiff in error guilty as charged in the indictment. The court refused to grant a new trial, and pronounced judgment of death upon the prisoner, from which an appeal in error has been prosecuted to this court. It is not necessary, in the view we have taken of the case, to state the evidence in detail; a mere outline will be sufficient to raise the questions of • law presented for our determination, except the question in relation to the admissibility of the prisoner’s confession.
The infant, of whose murder the prisoner stands convicted, was of extremely tender age, only five weeks old; and the *160 death was caused by an over-dose of laudanum administered by the prisoner, without the knowledge of any one, and contrary to a general command, not to give the child anything whatever.
The prisoner is of immature age, being, at the time of the alledged murder, not over fifteen years. A day or two preceding the death of the infant, the prisoner was taken from the negro-quarter on the plantation and put in the house to serve in the capacity of nurse. On the day of the infant’s death, Mrs. Man* went into another room to attend to some of her domestic affairs, leaving the child asleep in the cradle in care of the prisoner. She remained absent about fifteen minutes as she supposes, during which time the laudanum was administered. The child survived about four hours. A physician was immediately sent for, but did not arrive until about two hours after the laudanum was given, and his efforts to counteract its effect were unavailing. He states, that the death was caused by an over-dose of laudanum, and that half a drop was as large a dose as the infant could have borne.
The prisoner for some time denied having given laudanum to the infant. Her master was much excited; inflicted blows with his hand upon the prisoner; threatened to shoot her, but was induced to desist by the persuasion of his wife, and sent her off to the quarter, where she was put in chains around her body and neck. On Saturday evening after the death of the child, which happened on the preceding day, Nichols, the overseer of Marr, and Giles, the overseer of Perkins, who lived on an adjoining farm, went together after night to the house where the prisoner was confined. Giles states, that she' was asked by him, “how she came there;” seemed slow in speaking. Nichols told her to speak. She then said she had given laudanum to the baby and it had killed it. He then asked her how she came to do it? She said Tom had been at her to meet him out at night, and told her if she would *161 give it laudanum it would sleep until she could get back; that she had asked him if it would hurt; he said no, he had given it many times to his wife Eliza, and it never hurt her.” She was told, she had better come out and tell the truth — it would be better for her. She was asked if she would make the same statement before Tom, that she had made to witness and Nichols; she said she would. Witness and Nichols then went to Tom’s house and took him into the house where prisoner was, and told her to tell her tale again. She said Tom had recommended her to give it, and it would make the baby sleep till she could get back; and she asked him if it would hurt. Tom denied all this. She said she thought she would try and see if it would make it sleep, and had poured some in her hand and given it. That since she had been chained, Tom had been there and told her she bad given it wrong — ■ that she ought to have put some brandy in it, and sweetened it, and warmed it, and then the child would not have died in several days; that he told her she must admit she had given it, but not to call his name or he would shorten her days. Tom denied all this.” Witness further stated, that “in the first talk with her, he told it would be better for her to come out and tell the truth.”
Nichols’ statement of the prisoner’s confession is somewhat different from that of Giles; but we have thought proper to take the latter as probably the more correct and reliable statement.
There is proof in the record of an improper intimacy having existed between Tom (who was of mature age) and the prisoner for some weeks previous to the removal of the latter from the quarter to the house. The witness Nichols, speaks of one occasion when he detected them, but he says, “he passed on and said nothing, as it was no business of his, and he did not care what they did.”
Judging from this avowal of the overseer, the morals of the *162 slaves under his dominion were in bad keeping; and it is not much to be wondered at, that the prisoner — who was brought up at the quarter — had a more imperfect sense of the obligations of morality and common decency than is even usual among those of her own caste and social condition.
The circuit judge, in his instructions to the jury — after stating the general definition of murder and malice, and laying down some general principles, the correctness of which is not questioned — said: “If Ann, the prisoner, by force poured laudanum into the mouth of Mary E. B. Marr, such act, unless excused or justified by the evidence, would amount to a battery, and she would be responsible in law for the natural effects of the laudanum although they may have been more serious than she designed or expected.”
“If Ann was the slave of Nicholas Marr, the witness, and was employed by him to attend to Mary E. B. Marr; and if she was ordered by her master not to administer any thing to the said Mary E. B. Marr; if she, without authority, wilfully administered laudanum to said Mary, intending thereby to produce unnecessary sleep, and contrary to her expectations it caused death, she would be guilty of murder.”
The first question for our consideration is — was the confession of the prisoner — which was objected to — properly admitted as evidence to the jury ? This is a question which admits of no discussion. All the authorities concur, that a confession, to be admissible as evidence, must have been freely and’ voluntarily made, and not under the influence of promises or threats. As to what is such a promise or threat as will exclude a confession, it is laid down, that saying to a prisoner it will be worse for him if he do not confess; or that it will be better for him if he do, is sufficient to exclude the confession. 2 East. P. C. 659. So where a surgeon called to see a prisoner charged with murder, said to her, “ you are under suspicion of this, and you had better tell all you know,” *163 the confession was held inadmissible. - 4 C. and P. 387. So where it was said to the.prisoner, “ it would have been better if you had told at first,” the confession was rejected. 6 C. and P. 175. It would be a useless labor to multiply authorities upon a point in respect to which there is no substantial disagreement to be found in the books. Nor would it be more profitable to indulge in speculation as to the probable influence of such a promise or threat in a particular case; certainly not in the case of a timid girl, of tender age, ignorant and illiterate, a slave and in chains, whose life had been threatened by her master, and against whom the hand of every one, even those of her own color and condition, seems to have been raised. In such case, and in all cases, the law presumes, and conclusively presumes, that an influence was exerted upon the mind of the prisoner, and, therefore, all inquiry upon the subject is precluded.
2nd. The next question is, was the law correctly stated to the jury ? We think not. The errors of the charge will be obvious from the mere statement of a few plain elementary principles.
To constitute the crime of murder by the common law, and by that law this case is to be governed, the killing must be with malice aforethought: no matter by which of the thousand means adequate to the destruction of life, the death may have been effected. Malice, in its legal sense, is the sole criterion by which murder is distinguished from every other species of homicide. The malice essential to constitute the crime of murder, however, is not confined to an intention to take away the life of the deceased'; but includes an intent to do any unlawful act which may probably result in depriving the party of life. It is not, in the language of Blackstone, so properly spite or malevolence to the individual in particular, as an evil design in general, the dictate of a wicked, depraved, and ma *164 lignant heart; and it may be either express or implied in law. 4 Bl. Com. 199-200,
If an action, unlawful in itself, be done deliberately and with intention of mischief, or great bodily harm, to particulars, or of mischief indiscriminately, fall where it may, and death ensue; against or beside the original intention of the party, it will be murder. But, if such mischievous intention do not appear, (which is matter of fact to be collected from the circumstances,) and the act was done heedlessly and incautiously, it will be manslaughter only. Foster 261. But, if the death ensue in the performance of a lawful act, it may amount either to murder, manslaughter, or misadventure, according to the circumstances by which it is accompanied. Ibid 262, 1 Hale, 472, 4. Bl. Com. 192.
These general principles apply as much to a case where death ensues by means of a medicine of poisonous qualities, as to any other species of homicide. It is true, that where one wilfully poisons another, from such deliberate act the law presumes malice, though no particular enmity can be proved, (4 Bl. Com. 199.) But this presumption may be displaced in a case of death from poison, as in other cases, by direct proof, or by the circumstances of the particular case.
If, as Blackstone says, the poison were wilfully administered, that is, with intent that it should have the effect of destroying the life of the party : or if, in the language of Foster, the act were “ done deliberately and with intention of mischief, or great bodily harm,” and death ensue, it will be murder. But if it were not wilful, and such deliberate mischievous intention do not appear; and the act was done heedlessly and incautiously, it will be only manslaughter at most.
Testing the charge by these familiar principles, it is manifestly incorrect in several respects. It assumes, that if the prisoner administered the laudanum in violation of her master’s order, for the purpose of “producing unnecessary sleep,” *165 and death ensued, contrary to her intention, she is guilty of murder. This is not law. In the first place, the charge puts the disobedience to the master’s order, on the same footing with a violation of a command or prohibition of the law. This is a great mistake. Such violation of the master’s order, is not an “ unlawful act” in the sense of the rule above stated. It is no offence against the law of the land: nor is it cognizable by any tribunal created by law. It is an offence simply against the private authority of the master, and is cognizable and punishable alone in the domestic forum. Again: the criminality of the act is made to depend upon an intent, with reference to the deceased infant, which may be in law, if not positively innocent, at least comparatively so.
The laudanum may have been given by the prisoner in utter ignorance of the fact that it possessed any poisonous quality; and there may have been a total absence of any intention to do serious injury, or indeed injury of any sort, much less to destroy the life of the child- If the prisoner’s purpose really was, to superinduce a state of temporary quietude or sleep, without more, in order to afford better opportunity, or greater facility, for carrying on her own illicit intercourse with Tom, this, however culpable in morals, would not involve her in the guilt of murder.
The tenderest of mothers might administer laudanum to her infant incautiously, in order to be enabled to attend to some pressing call of her household affairs, which admitted of no delay : or a gay and thoughtless matron, devoted to 'the pursuit of pleasure, though not devoid of natural affection for her infant, might give a similar dose in order to have opportunity to attend the theatre or ball-room for a time. And although in both the latter cases the motive, so far as respects the actors, is different, and less offensive to morals or propriety) yet the purpose or intention, with reference to the effect to be produced upon the child, is the same, in kind at least, *166 that is, in the language of the charge, to “ produce unnecessary sleep.” And yet, perhaps, no one would contend that, had death ensued, in either case, the mother would have been guilty of either murder or manslaughter.
In the case of the prisoner, her relation as a slave, taken in connection with her disregard of her master’s positive direction, and the gross heedlessness and incautiousness of the act, might constitute her offence manslaughter, but certainly nothing more. <
The charge of the Court then, is not only erroneous in excluding from the consideration of the jury, the questions of fact, whether or not the prisoner had knowledge of the poisonous quality of laudanum, and whether or not there existed in the mind of the prisoner an intent to kill, or to do serious injury to the deceased; but likewise, in not submitting it to the jury to determine the grade of offence, whether murder or manslaughter.
If the offence amounted to no more than manslaughter, as we hold to be clear, then the Circuit Court had no jurisdiction of the case.
In the case of Nelson, a slave, vs. the State, at the last Term at Jackson, it was held that, by our law, manslaughter might be committed by a slave; but that the Circuit Court had no jurisdiction of such case. In delivering the judgment of the court in that case, Judge Green says, it is true, an indictment against a slave for murder, does not include a charge of manslaughter, because by the act of 1819, ch. 35, sec. 1. murder, committed by a slave, is declared to be capital, and by the act of 1835, ch. 19, sec. 9, exclusive original jurisdiction is given to the Circuit Courts, of all offences committed by slaves, which are punishable with death: and as manslaughter is not so punishable, the Circuit Court has no jurisdiction thereof.
By the act of 1815, ch. 138, (2 Scott’s Rev. 246-247) a spe *167 cial tribunal, consisting of three Justices and nine freeholders and slave-holders, is created for the trial of all offen-ces committed by slaves, that are not capital, with authority to “ pass such judgment, according to their discretion, as the nature of the crime or offence shall require,” not affecting life or limb. By the act of 1819, ch. 35, sec. 1, murder, arson, burglary, rape, and robbery, when committed by slaves, are declared capital, and to be punished with death; and all other offences are to be punished as theretofore, provided, however, that such punishment shall not extend to life or limb.
The judgment of the Circuit Court will be reversed.